Rockingham,
Jan. 5, 1943. } No. 3387.

MAINE-NEW HAMPSHIRE INTERSTATE BRIDGE AUTHORITY

*v.*

RICHARD H. HAM ESTATE.

*Sewall, Varney & Hartnett (Mr. Sewall* orally), for the plaintiff.

*William H. Sleeper* (by brief and orally), for the defendant.

PAGE, J.   The land taken by the plaintiff was a strip for the New Hampshire approach to the interstate bridge.   This strip extended northeasterly from Maplewood Avenue and varied in width from one hundred to one hundred and twenty feet.   It cut diagonally across the Ham premises and had a mean length of something over five hundred feet.

On the Ham premises there were several buildings: (1) North of the approach, a two-apartment house, which was left intact, and from which a driveway was laid without cost to the late Mr. Ham. This driveway extended to the approach, and on the opposite side of the approach it followed a former driveway maintained by Mr. Ham across his own land to Maplewood Avenue.   (2) South of the approach and fronting on Maplewood Avenue, a three-apartment house and a barn, both of which were left intact.   (3) A four-stall garage, which was demolished, since it stood partly in the land taken for the approach.   This garage had rented continuously for sixteen dollars a month.   The rentals received from the other buildings have not been affected.   In front of the three-apartment house the plaintiff raised the level of Maplewood Avenue to about the height of the upper part of the first-story windows, in order to reach an overpass constructed over the approach.   The tenants have made some complaints about dust from the road as now raised, and also about drainage from the ramp.   However, they remain and pay rent as before.

Before the condemnation, the Ham property included about six acres extending from Maplewood Avenue to the river. Through this the city of Portsmouth laid a sewer in the spring of 1929, in such location as would permit a street to follow its course, leaving a tier of building lots on each side. In the fall of 1929, Mr. Ham conceived the thought of developing this tract for the sale of lots, but he never did anything to carry the idea into effect. The strip taken for the approach includes what would have been the mouth of the "proposed" street, but since the "street" and the approach would make an acute angle with each other, there is a point where the two would converge, if the street were ever actually laid out. As far as appears no plan of the tract was ever made until May, 1940, the month of the second of two takings by the plaintiff, the first being seventeen months earlier. The "project" conceived in 1929 never reached even the paper stage until the time of the second taking.

According to the undisputed testimony, the portion of the tract north of the approach could still be divided into lots facing the "street" as laid down on the plan, and a slight partial relocation of the "street" would give access from the lots to the approach, and thus to the world at large. Some nine of the thirty-two lots laid down on the plan would be eliminated, but seven of the nine would for the most part lie on a lower level than the others, and hence be the least valuable and desirable.

The defendant tried the case, however, on the legal theory that the lots along the "street" would all be worthless, because their owners would have no right of ingress and egress through the approach; that the approach is a private way which can be used only by the plaintiff's grace; and that the land thus "isolated" is useless to the defendant for development and worth only some thirty-five dollars an acre for possible agriculture. Counsel for the plaintiff admitted during the trial, however, that the approach is a public highway.

The court charged the jury that while the Authority might regulate the approach, "the regulations must be reasonable and the use by the adjacent owners must be reasonable and consistent with the purposes for which the bridge and its approaches were intended and any regulations or rules set up by the Authority as to the use of the highway or as to the rights of contiguous owners must be reasonable and if those rules and regulations are unreasonable the law I think will give relief." He also charged that the property taken is held in trust for the public, that it has become a public

highway and that everybody has the right to make any use of it not inconsistent with its use as an approach to the bridge. To this instruction the defendant excepted.

The defendant also excepted to the denial of requests for instructions which in substance declared that the Authority had unlimited power to make rules and regulations for the use of the road; that those permitted by the Authority could use it, and nobody else except those who might pass across it or enter from public highways; that the defendant could reach the two-apartment house north of the approach only by sufferance of the Authority; that the defendant had no right of way to any of the land shown on the plat of house lots "proposed," and the jury were entitled to consider this in determining the depreciation in value caused by the taking; that the defendant had no right to cut across the east-bound lane of the approach.

The defendant relied for damages largely on this theory of law rejected by the court. The defendant's brief persists in this theory of lack of right, saying, "The verdict was certainly a 'snap judgment' formed without regard to the importance of the evidence bearing upon the loss . . . of access to the public highway known as Maplewood Avenue." The defendant asserts in effect that the jury hastily decided the matter without considering the evidence that the instructions in substance told them not to consider. It is true that the defendant's expert estimated damages to the two-apartment house at $7,000, in express reliance on the defendant's legal theory. It is also true that the same expert, on the same theory, estimated at more than $10,000 the damage to the other lots supposedly "isolated." Over $17,000 of the defendant's claim rests upon the rejected theory, under which theory the defendant denied the possession of conceded rights in order to get more money. The defendant's position overlooks distinctions between law and facts, and between the facts applicable under diverse theories of the law. More fundamentally, the defendant forgets that in our country the retention of the rights of individuals is of infinitely greater importance than monetary compensation, and that compensation is given only for private rights taken for public use.

For purposes of this case, the view of the law taken by the Presiding Justice was as favorable as the defendant could ask. The interstate compact which resulted in the creation of the Authority premised that the former single highway bridge connecting the two states at Portsmouth was wholly inadequate to accommodate inter-

state vehicular traffic, in consequence of which there was traffic congestion in Portsmouth, and also in Kittery, Maine. Therefore, and clearly for public use and benefit, a new interstate bridge and approaches were required. The two states thereupon undertook to construct them, "holding the same in high trust for the benefit of the nation and of the said two states." Laws, Special Session 1936, c. 4, s. 1. No dedication to the public could be broader. A public highway was contemplated.

The fact that tolls were to be charged for passing the bridge indicates no more than a method of financing the project. The Authority was set up as a governmental body to carry out the public purposes. Laws, Special Session 1936, c. 4, s. 16. The nominal owner of the toll bridge is the Authority, but the Authority is not a private corporation; it is a public corporation of which the two states are the sole members, and they are the real owners in trust for public use. *Opinion of the Justices*, 70 N. H. 638. The highway over the bridge is as much a public highway as that over any other toll bridge owned and operated by the state. The New Hampshire approach is also a public highway, just as much as the approaches built by the State for the John Sullivan Bridge. Abutting owners have full right to access thereto except within the toll-gate limits, where they are subject to "rules and regulations [made by the Authority] governing use of the bridge and any of the other services made available in connection with said bridge." Rules and regulations include, by definition, "charges, rates, rentals or tolls." It seems, without deciding, that within the toll gates the rights of abutting owners to cross the road may reasonably be somewhat more restricted than elsewhere, providing the restriction is necessary to protect the bridge from use by those not paying tolls. But this is not necessary to the disposal of this case, since for all that appears, the defendant may have all the crossing rights reasonably needed west of the tollgate.

If any regulation is attempted concerning entrance upon, or use of, portions of the approach west of the New Hampshire gate, it must be a reasonable one, as the court below charged. Without deciding here what regulation would be reasonable or whether the Authority could make some regulations, such as speed or stop-signs, without the concurring action of other state authorities, we are of the opinion that it would be clearly unreasonable for any public authority to deny the defendant the right of access to the approach from the proposed "street," or from land contiguous

to the two-apartment house or the three-apartment house, or to deny the right to cross the highway west of the tollgate. In that situation, the project for development of the defendant's land remaining after the takings could not be materially affected. The defendant's view of the law, and consequently of damages, was untenable.

The damages assessable on the "development" relate to only nine of the thirty-two "proposed" lots. These nine lots were valued by the defendant's expert at $5,500 before taking. But this estimate was subject to some correction for costs of development and sale, including the improvement of the "street," which he testified would cost a thousand dollars. Moreover, the jury were at liberty to reject the expert's figures. His figures for the damages to the three-apartment house showed a depreciation from $10,000 to $3,000, and the jury were entitled to reject both the "before" and "after" estimates. The same holds true of the two-apartment house, with spreads from $11,000 (more than the house cost in 1922) to $4,000, the latter on the ground of supposed isolation. *Hackett* v. *Railroad*, 89 N. H. 514.

For the plaintiff, two experts testified. One thought the total damages were $5,000 to $5,500, including $1,500 for the garage that could be replaced on defendant's land for $750; the other thought them only $3,500. Both testified upon the supposition that the law was as the Presiding Justice declared it; the defendant's witness testified on the erroneous theory, and was not asked to testify otherwise, though it was apparent from the first that the Presiding Justice was going to reject the defendant's theory. The defendant, having staked everything on a mistaken view of the law, now complains that the verdict is adverse.

The case was closely tried. There is no reason to think that the jury did not understand the issues or the evidence, and their verdict was well within the bounds of the evidence. It was not a compelled finding that they failed to deliberate properly or that their verdict was inadequate or contrary to the law and the weight of the evidence. *Wisutskie* v. *Malouin*, 88 N. H. 242; *Dunsmore* v. *Company*, 90 N. H. 470. Indeed, it might almost be said that the defendant's testimony held so rigorously to an erroneous theory of law that there was no evidence to justify a larger verdict.

The defendant excepted to the admission of questions based on the assumption that the "street" could still be built and access had to the approach. For reasons already stated, the rulings were

correct. Exceptions were also taken to testimony concerning the price at which adjoining property had been offered for two years, without a taker, though efforts had been made to find one. There was no question that the property was similarly located, and the time of the offer was not remote. There was testimony that the property was better adapted for development than the Ham property, its whole length being on a public street.

Evidence of sales prices of similar property at nearly the same time are admissible to show value. *Thornton* v. *Campton*, 18 N. H. 20, 25; *Concord Railroad* v. *Greely*, 23 N. H. 237, 242. So is evidence of the price in a sales contract unexecuted. *Ferguson* v. *Clifford*, 37 N. H. 86, 104. The evidence here admitted had rational probative value and was properly admitted because there is no specific rule of exclusion. *Rowe* v. *Company*, 86 N. H. 127, 130. If there be any difference between an accepted offer and an unaccepted offer, it is one of weight only, not of relevancy. Business decisions are reached on such evidence, and business decisions are the stuff out of which market values are made. While testimony of an unaccepted offer might be excluded in discretion if not likely because of circumstances to be of assistance to the jury, it cannot be said that this evidence could not, on the whole, aid the jury. Failure to sell this fourteen-acre tract at $13,000, after two years trial, even though it had a four-apartment house superior to the defendant's three-apartment house, had logical tendency to show that the five acres of Ham property adapted for development and without a building on it, had a market value of much less than that. Yet the defendant claimed for the five acres a market value of $18,500. The jury would be aided, not prejudiced, by the reception of evidence such as was received.

The defendant also excepted to the reception of a Portsmouth assessor's opinion as to the depreciation of the property because of the taking. The witness was not asked for the assessed valuation. His opinion was receivable, the court having found that his experience in assessing in the community qualified him. The exclusion of assessed valuation because made in the party's absence (*Concord &c. Company* v. *Clough*, 69 N. H. 609) or as hearsay (Wigmore, Evidence (3d *ed.*), s. 1640) furnishes no precedent for the exclusion of opinion evidence by an assessor in court and subject to cross-examination.

*Judgment affirmed.*

All concurred.